**TRINITY EPISCOPAL SCHOOL CORPORATION** and **Trinity Housing Company, Inc., Plaintiffs-Appellants,**

**Roland H. Karlen et al., Intervening Plaintiffs-Appellants,**

**v.**

**George ROMNEY, Secretary of Dept. of Housing and Urban Development, et al., Defendants-Appellees,**

**Strycker's Bay Neighborhood Council Inc., Intervening Defendant-Appellee.**

**Nos. 840, 902, Dockets 75–7061, 7092.**

United States Court of Appeals, Second Circuit.

Argued March 10, 1975.

Decided July 24, 1975.

Eugene J. Morris, Martin Stuart Baker, New York City (Demov, Morris, Levin & Shein, New York City), for plaintiffs-appellants.

David P. Land, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y.; Peter C. Salerno, Asst. U. S. Atty.; Marttie L. Thompson, Community Action for Legal Services, Inc.; John de P. Douw, Staff Counsel; W. Bernard Richland, Corporation Counsel of the City of New York; Leonard Koerner, Robert F. Liner, Hadley W. Gold, Asst. Corp. Counsels, New York City, of counsel), for defendants-appellees.

Before MOORE, MANSFIELD and GURFEIN, Circuit Judges.

MOORE, Circuit Judge:

The plaintiffs Trinity Episcopal School Corporation (Trinity) and Trinity Housing Company, Inc. together with Intervening-Plaintiffs Roland H. Karlen, Alvin C. Hudgins and CONTINUE (Committee Of Neighbors To Insure a Normal Urban Environment) appeal from judgments in favor of defendants, who for purposes of brevity may be stated as the United States Department of Housing

and Urban Development (HUD), its Secretary, the Regional Administrator of HUD, the New York State Division of Housing and Community Renewal and its Commissioner, the Mayor of New York, the City Planning Commission, various City officials and the City of New York (City). Strycker's Bay Neighborhood Council, Inc. is an Intervening Defendant-Appellee.

Trinity (non-sectarian and inter-racial) is an elementary and secondary educational institution (grades 1 through 12) founded in 1709 and presently located between West 91st Street and West 92nd Street and between Amsterdam and Columbus Avenues in New York City. Prior to 1962 because of the deteriorated state of the area Trinity claims that it was considering moving its facilities outside of the City of New York.

Trinity argues that, relying upon representations of the City and upon the West Side Urban Renewal Plan (the Plan) promulgated by City and State agencies to rehabilitate a designated twenty-block area,[1] Trinity abandoned its plans to move and instead agreed, together with Trinity Housing, to become a sponsor of Site 24[2] in the renewal area to develop additional school facilities and housing. The school addition was to be financed by Trinity and the housing was to be a "middle-income" project under the Mitchell-Lama Law. (McKinney's, New York Private Housing Finance Law. Consol.Laws, c. 44B, Vol. 41.)

Trinity asserts that it was induced to "sponsor" Site 24 upon representations of certain government officials that the Area would be developed to include at most 2,500 units of low-income housing and that in the middle-income buildings there would be 30% low-income and 70% middle-income housing units.[3]

The intervening plaintiffs assert that they purchased their brownstone dwellings and rehabilitated them relying upon similar City representations as to income mix of the area.

The focal point of this controversy is Site 30, originally designated for middle-income housing, which has been changed by the defendants to low-income housing containing 160 units.[4] The plaintiffs would have the court reinstate Site 30 as a middle-income project and enjoin both construction thereon as low-income housing and the use of federal funds therefor. The reasons assigned for court interference may be summarily condensed as follows:

I. Breach of contract by defendants in failing to live up to their representations.

II. Failure by the defendants to conform to the purposes and intent of the Plan to establish an integrated community in the Area.

III. Establishment of a "pocket ghetto" of a nonintegrated nature (namely, a concentration of low-income housing) in Trinity's immediate area; and

IV. Lack of compliance by HUD with essential requirements and conditions of the National Environmental Policy Act (NEPA).

Defendants contend that the 2,500 unit figure for low-income housing represented merely an estimate or goal and further emphasize that the contract and Plan authorized the City to make changes in the Plan as development progressed. They argue that the change of Site 30 from middle-income to low-income housing was necessitated by the need to relocate persons removed from the Area during renewal and rehabilitation as well as by the general housing needs of low-income residents of Man-

---

1. The area embraced by the Plan extends from 87th Street to 97th Street and from Central Park West to Amsterdam Avenue (the Area).

2. Site 24 is immediately adjacent to the existing school on the west side of Columbus Avenue between 91st and 92nd Streets.

3. The contract between Trinity and the City for Trinity's development of Site 24 provided for occupancy on this basis.

4. Site 4 was also changed from middle- to low-income housing but there are no funds available to proceed with development of this parcel.

hattan. Finally they argue that HUD was not required to consider any alternatives to low-income housing on Site 30 because the project will not significantly affect the environment and because there are no unresolved conflicts concerning the use of alternative resources.

The trial court gave the most meticulous attention to the many issues involved, most of which were factual. Twenty-five days of non-jury trial over a period of eight months, hundreds of exhibits, hundreds of pages of affidavits and testimony, all have resulted in a record of 13 large volumes, which together with briefs have been presented to us for our appellate consideration. The facts and the law have been set forth in an opinion by the trial judge of 41 pages which bespeaks the careful consideration which he gave to the case.[5] In commencing appellate review we can well use as a prologue the trial judge's epilogue:

"This case has troubled us greatly. The goal of a racially, ethnically, and economically integrated community is sought by many, but the road to achieving it is protracted and ofttimes perilous, a course frequently encountered where objectives are laudatory. The hopes, fears and needs of different classes and races must somehow be reconciled if urban peace is to be attained." (387 F.Supp. at 1085.) This goal was obviously the intention of the Congress and the Plan. Equally obvious was it the goal in the minds of the plaintiffs when they agreed to participate in the Plan. In their opinions the deviation has been so drastic as to call for the relief which they seek.

### I.

■ It would be pointless to reanalyze the factual background so thoroughly and ably covered in the trial court's opinion. Basic to plaintiffs' position is their claim of breach of contract. However, before entering into the contract Trinity knew that the Plan had previously undergone four revisions and that these revisions had materially altered the original concepts as to the low-income, middle-income ratios. Furthermore, the contract itself specifically authorized modification and amendment by the City.[6] In view of this express provision, an implied provision to the contrary would not be warranted. The trial court properly held that the changes in the number of low-income units and the ratios between low and middle did not constitute a breach of contract.

■ With respect to the contention that the defendants' failure to adhere to a maximum number of 2,500 low-income units and a 70 to 30 percent ratio of middle to low income housing violates the purposes and intent of the Plan, the evidence regarding the extent of crime and social problems associated with "ghettoization" was conflicting. Furthermore, we cannot label as clearly erroneous the District Court's conclusion that existing or threatened community problems or deterioration are not attributable to an increase in the number of low income families in the community rather than to other causes.

### II.

Plaintiffs, relying on our decision in *Otero v. New York City Housing Authority*, 484 F.2d 1122 (2nd Cir., 1973), argue that the conversion of Site 30 from middle- to low-income housing will cause a concentration of three public housing projects on 91st Street—the Trinity block—and that a "pocket ghetto" is thereby created in that area. The trial judge concluded "for the purposes of this litigation that the tipping point of a community is that point at which a

---

5. *Trinity Episcopal School Corporation v. Romney*, 387 F.Supp. 1044 (S.D.N.Y.1974).

6. Section F of the 1966 Fourth Revision of the Plan, which was annexed to and incorporated into Trinity's contract with the City, specifically authorized modification and amendment.

set of conditions has been created that will lead to the rapid flight of an existing majority class under circumstances of instability which result in the deterioration of the neighborhood environment." (387 F.Supp. at 1065–1066). To determine whether an area has reached that point he specified three criteria: (1) gross numbers of minority or measurable economic or social group families likely to affect adversely Area conditions; (2) the quality of community services and facilities; and (3) the attitudes of majority group residents. As to (1) the court found that plaintiffs had shown "nothing to rebut the conclusion that the Area is both racially and economically sound." As to (2) the court found that the crime and vandalism in the Area was localized within three controversial buildings and concluded that despite "substantial testimony of numerous deplorable antisocial acts within the Area, the totality thereof does not depict a general deteriorating condition." As to (3) "Community Attitudes" the court believed that "where, in light of the lack of alternative decent low income housing, a tipping analysis may mean an outright denial of housing to persons on the basis of suspect racial or economic classifications, such analysis must focus particularly upon objective and measurable criteria . . ." (387 F.Supp. at 1072). Accordingly, the court concluded that "plaintiffs have not shown convincing evidence that the Area is in danger of tipping or that construction of public housing on Site 30 would cause tipping." (387 F.Supp. at 1073).

▮ Thus far we have considered the trial court's conclusions based on facts presented by both groups, plaintiffs and

defendants, and although there may have been room for differences of opinion, we cannot accept plaintiffs' arguments that the Court's conclusions are clearly erroneous.

## III.

There remains, however, an important point of law raised by plaintiffs, namely, that the agencies in question have failed to comply with the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (NEPA), in considering whether to award federal funds for development and use of Site 30 as public housing according to the redesignation. More specifically the question is whether the processing of the Special Environmental Clearance [7] by HUD which resulted in the conclusion that the public housing project on Site 30 would not have a significant adverse impact on the environment was conducted in compliance with the procedural and substantive mandates of NEPA and HUD's own guidelines.

The lower court found 1) that consideration of alternatives is necessary only in the context of an EIS and 2) that HUD acceptance of the conclusion of the Housing Authority that, considering the scarcity of available sites and the unmet needs for public housing, there are no alternative sites, fulfilled HUD's duty to consider alternatives. (387 F.Supp. at 1082). We hold that these two conclusions as a matter of law fail properly to articulate or scrutinize HUD's responsibilities as mandated by NEPA. We believe that HUD failed to comply with the mandate of § 102(2)(D) [8] of the Act

7. HUD has adopted a three-level approach to compliance with NEPA consisting of: 1) Normal Environmental Clearance; 2) Special Environmental Clearance; and 3) Environmental Impact Statement *HUD Handbook 1390.1*, 38 Fed.Reg. 19182 (July 18, 1973). These three levels represent increasingly detailed or stringent review with only the third level involving formal review by other agencies. This structure recognizes that federal agencies are responsible for consideration of environmental factors whether or not an environmental impact statement is required. HUD's regulations provide that under certain circumstances level

2 is the primary environmental review and in this case the project is in the category where a Special Environmental Clearance is mandated by HUD regulations since it is a housing project with more than 100 units.

8. 42 U.S.C. § 4332(2) provides as follows:
". . . all agencies of the Federal government shall . . .
(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unre- . solved conflicts concerning alternative uses of available resources . . ."

and that compliance therewith is a prerequisite to any further federal action on the Site 30 project.

█ Federal agencies must consider alternatives under § 102(2)(D) of NEPA without regard to the filing of an EIS and this obligation is phrased to encompass a broad type of consideration—"study, develop, and describe." In *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693 at 697 (2d Cir. 1972), this Court emphasized the importance of consideration of alternatives under § 102(2)(D). The statute states in broad language that alternatives must be considered with respect to "any proposal which involves unresolved conflicts concerning alternative uses of available resources." Although this language might conceivably encompass an almost limitless range, we need not define its outer limits, since we are satisfied that where (as here) the objective of a major federal project can be achieved in one of two or more ways that will have differing impacts on the environment, the responsible agent is required to study, develop and describe each alternative for appropriate consideration. *Cf. Hanly v. Kleindienst*, 471 F.2d 823, at 835 (2d Cir. 1972).

The Fourth Circuit recently considered the mandate of § 102(2)(D) and we agree that this section requires thorough agency action:

> Clearly, Section 102(2)(D) is supplemental to and more extensive in its commands than the requirement of 102(2)(C)(iii). It was intended to emphasize an important part of NEPA's theme that all change was not progress and to insist that no major federal project should be undertaken without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means. In *Natural Resources Defense Council, Inc. v. Morton*, [458 F.2d 827 (D.C.Cir. 1972)] *supra*, the District of Columbia Circuit recognized that this section did

not intend to limit an agency to consideration of only those alternatives that it could adopt or put into effect. We agree. The imperative directive is a thorough consideration of all appropriate methods of accomplishing the aim of the action, including those without the area of the agency's expertise and regulatory control as well as those within it.

*Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123 at 1135 (4th Cir. 1974).

We have recognized in this Circuit that NEPA's review encompasses in the urban setting the quality of urban life.

> The National Environmental Policy Act contains no exhaustive list of so-called environmental considerations but without question its aims extend beyond water and air pollution. (Citations omitted). The Act must be construed to include protection of the quality of life of city residents. Noise, traffic, overburdened mass transportation systems, crime, congestion, and even availability of drugs all affect the urban "environment" and are surely results of the "profound influences of . . . high density urbanization and industrial expansion."

*See Hanly v. Mitchell*, 460 F.2d 640 (2d Cir. 1972); *Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972).

█ The case law, the guidelines of the Council on Environmental Quality, 36 Fed.Reg. 7724 (1971), and the regulations of HUD, 37 Fed.Reg. 22673 (1972) and 38 Fed.Reg. 19182 (1973), themselves indicate that federal agencies must consider the following urban factors in a project like the one at hand: site selection and design; density; displacement and relocation; quality of the built environment; impact of the environment on current residents and their activities; decay and blight; implications for the city growth policy; traffic and parking; noise; neighborhood stability; and the existence of services and commercial enterprises to service the new residents. It

is against this background of urban environmental factors that HUD was required by its own regulations and by the legislation as well to consider a variety of alternatives such as: alternative locations or sites; alternative of not building; alternative designs both in use of site and in size of individual units and number of total units; dispersal of the low income units on more sites in the project area; alternative measures for compensating or mitigating environmental impacts; and alternatives requiring action of a significantly different nature which would provide similar benefits with different impacts such as rehabilitation of existing buildings in the Area as public housing projects. *See, e. g.,* 40 CFR § 1500 *et seq.*

HUD, despite noting that there was considerable organized opposition to the project motivated by alleged social impacts, concluded that these "impacts are not environmental impacts within the context of Section 101(b) of NEPA".

 The only statement of HUD in the Special Environmental Clearance dealing with alternatives simply adopts the conclusion of the New York City Housing Authority that there are no alternative site locations because of the scarcity of land. This blanket generalization unsupported by the evidence as to alternative sites within the area (not to mention other potential sites) does not conform with HUD's responsibilities. HUD is not required to search out potential sites throughout the New York metropolitan area but the federal agency must itself determine what is reasonably available especially where as here the building of public housing is part of a coordinated plan to deal with the broad problem of meeting the housing needs of low income residents.

In *Greene County Planning Board v. F.P.C.,* 455 F.2d 412 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), (cite) we noted the danger of accepting without question the self-serving statements or assumptions of local agencies in connection with the preparation of EIS's. This danger is equally apparent where an agency like HUD accepts an unsupported statement as to lack of any alternatives from "interested" local agencies. Furthermore in the context of legislation that requires federal agencies to affirmatively develop a reviewable environmental record, even where the agency determines that an EIS is not required, a perfunctory and conclusory statement that there are no alternatives does not meet the agency's statutory obligation. *See Hanly v. Mitchell, supra,* 460 F.2d at 647.

HUD's emphasis on "the unmet needs for public housing" rather indicates that any search for, or investigation of, alternatives was either highly limited or nonexistent. The statement of possible alternatives, the consequences thereof and the facts and reasons for and against is HUD's task. Such a statement should be made, not as HUD's concept or the Housing Authority's views as to how these agencies would choose to resolve the city's low income group housing situation, but as to how within the framework of the Plan its objective of economic integration can best be achieved with a minimum of adverse environmental impact. In this endeavor consideration might well be given to the entire West Side Urban Renewal Area, the percentage of low-income units in that particular location, the sizes, type and designs of existing and possible alternative housing, whether there may be ways of spreading low-income units throughout the area rather than concentrating them in a few plots such as Site 30, and whether rehabilitation of existing housing may be developed as a means of achieving the Plan's contemplated economic ratio. Those who live there and those who hope to live there are entitled to obtain their housing aided by federal funds in a balanced and integrated community as envisaged by the Plan. Nor is it sufficient to approach the problem on an Area-wide basis. The purpose of the Plan is integration—not concentration. That purpose would not be achieved by concentrating low-income housing on

91st Street and compensating for this segregation by an equal concentration of middle-income housing on 97th Street.

■ The unbalanced housing of which plaintiffs complain should be capable of a fair solution. As previously stated, solution is not for the courts but for the agencies. These very agencies seem to have been successful in the past. It may well be that the present imbalance is caused by an excessive desire to aid the low-income group and for this not unpraiseworthy motive to ignore the mandates of the Plan. However, it is not for courts or agencies to legislate. The very requirement of NEPA to seek "alternatives" was intended to have a salutory effect. If attention is paid to the Plan and its purposes, the agencies with the cooperation of the interested parties should be able to arrive at an equitable solution. This result is best accomplished by remanding the case to the District Court to require a study by the appropriate agencies of possible "alternatives" with respect to the present proposal to change the development of Site 30 to 100 per cent low-income housing.

It may be that the factors which caused the trial court to list fifteen categories in which there was "convincing testimony by Area residents on these reprehensible[9] conditions" might well influence the appropriate housing agency to endeavor to minimize these dangers in its "alternatives" recommendations.

We agree with the trial court that an environmental impact statement is not required for the Area as a whole. Each section will have its own individual problems.

■ Lastly, we turn to appellants' argument that the District Court's decision should also be reversed because of the City of New York's failure to comply with § 514 of the General Municipal Law, McKinney's Consol.Laws, c. 24, which requires the City to file with the State Commissioner of Housing and Community Renewal a copy of each proposed urban renewal program or change in such program and obtain the Commissioner's approval, including his criticism and suggestions, before putting the program into effect. In the present case the City failed to comply literally with this requirement. However, as Judge Cooper pointed out, the incumbent Commissioner testified that she would have supported the proposed conversion of Sites 24 and 30. Although such a *nunc pro tunc* approval is hardly to be encouraged as a model procedure we believe that, since § 514 does not require the Commissioner to hold a hearing, her testimony amounted to substantial compliance with the statutory requirement and a remand for the purpose of following the strict procedure of the statute would not serve any useful purpose in the present case.

We find that HUD's acceptance of the "no alternatives" conclusion as a matter of law fails to meet the directive of 102(2)(D) of NEPA. We remand so that the District Court can fashion an appropriate order requiring HUD to consider reasonable alternatives to the development of Site 30 as a 100 per cent low-income housing project to the fullest extent possible using HUD regulations as guidelines for the type of alternatives and the context of urban environmental factors to be used in the process of consideration of alternatives, consistent with the scheme of the Plan.

---

**9.** Crime, drugs, vandalism, etc.