590 F.2d 39
 13 ERC 1769, 9 Envtl. L. Rep. 20,001
 Roland N. KARLEN, Alvin C. Hudgins and Continue, Plaintiffs-Appellants,
v.
Patricia Roberts HARRIS, Secretary of the Department of
Housing and Urban Development, The City of New
York and Strycker's Bay Neighborhood
Council, Inc., Defendants-Appellees.
 No. 1079, Docket 78-7147.
 United States Court of Appeals,
Second Circuit.
 Argued June 12, 1978.
Decided Dec. 14, 1978.
 
 A. David Benjamin, New York City (Demov, Morris, Levin & Shein, Eugene J. Morris and Jonathan M. Bryer, New York City, of counsel), for plaintiffs-appellants.
 Peter C. Salerno, Asst. U. S. Atty. for the Southern District of New York, New York City (Robert B. Fiske, Jr., U. S. Atty., New York City, of counsel), for defendant-appellee Harris.
 Carolyn E. Demarest, New York City (Allen G. Schwartz, Corp. Counsel of the City of New York, Leonard Koerner, New York City, of counsel), for defendant-appellee City of New York.
 John de P. Douw, New York City (Catherine P. Mitchell, Community Action for Legal Services, Inc., New York City, of counsel), for defendant-appellee Strycker's Bay Neighborhood Council, Inc.
 Before MOORE, MULLIGAN and GURFEIN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 This is the second appeal to come before us in "a case directly affecting the future of a 20 square block community and its more than 35,000 current and former residents."[1] The particular site (Site 30) involved is part of the West Side Urban Renewal Area ("WSURA" or "Area"), and is located on the west side of Columbus Avenue, between West 90th and West 91st Streets, in the Borough of Manhattan, City of New York. See Trinity Episcopal School Corp. v. Harris, 445 F.Supp. 204, 207 n.3 (S.D.N.Y. 1978). The area was to be developed in accordance with the West Side Urban Renewal Plan ("the Plan"), which had as its objective the rehabilitation of the area on an integrated basis both racially and economically. A detailed description of the Plan, its development and various amendments is set forth in the trial court's first opinion, Trinity Episcopal School Corp. v. Romney, 387 F.Supp. 1044 (S.D.N.Y. 1974).
 
 
 2
 An appeal from the decision approving the use of Site 30 for a low-income apartment building, which would be situated in a block containing other exclusively low-income buildings caused us to remand the case to the district court to ascertain from the Department of Housing and Urban Development (HUD) what consideration had been given to other alternatives[2] so that "(t)hose who live (in the Area) and those who hope to live there (would be) entitled to obtain their housing aided by federal funds in a balanced and integrated community as envisaged by the Plan". We said: "The purpose of the Plan is integration not concentration" and "that purpose would not be achieved by concentrating low-income housing on West 91st Street . . . ." Trinity Episcopal School Corp. v. Romney, 523 F.2d 88, 94 (2d Cir. 1975). Accordingly, we remanded for the consideration by HUD of reasonable alternatives to the development of Site 30 as a 100 per cent low-income housing project "consistent with the scheme of the Plan."On the remand, HUD produced a lengthy document, with many exhibits attached, entitled "Special Environmental Clearance of Department of Housing and Urban Development". It was filed with the district court on April 15, 1977. Thereafter defendants-appellees moved for summary judgment dissolving the injunction against building a 100 per cent low-income housing structure on Site 30 and dismissing the complaint. From the judgment dissolving the injunction and dismissing the complaint, plaintiffs-appellants appeal. The trial court's opinion is reported at 445 F.Supp. 204. A motion (F.R.Civ.P. § 60(b)) for correction of judgment was made by appellants and denied, from which denial plaintiffs-appellants also appeal.
 
 
 3
 Consideration of many of the environmental aspects relating to the construction of a 100 per cent low-income building on Site 30 which were treated in HUD's report (A 7-212)[3] is unnecessary. We remanded for the specific purpose of having "a study (made) by the appropriate agencies of possible 'alternatives' with respect to the present proposal to change the development of Site 30 to 100 per cent low-income housing." 523 F.2d at 95. We thought that "if attention is paid to the Plan and its purposes, the agencies with the cooperation of the interested parties should be able to arrive at an equitable solution". Our attention, therefore, must center on that portion of the HUD report which deals with "Impact on the Social Fabric and Community Structures" (Ex. 8, A 54) and "Notable Impacts and Alternatives" (A 67).
 
 
 4
 A survey by the City of nine undeveloped sites found that none were "appropriate alternatives". Amongst the reasons cited were that "(s) ubstantial delays would be imposed in relocating the development to another site" (A 67). The City's Housing and Development Administration (HDA) made additional comments as to three sites which it believed to be unacceptable. As to HDA's survey, the HUD report said "the City's evaluation of alternative sites seems incomplete. It did not address the possibilities of combining sites, of reparcelizing (Sic) sites, of dividing the 160-units committed to by HUD onto two of the redevelopment sites . . . ." (A 68). The report continued: "There are two alternative sites which are even more appropriate for the transfer of the proposed 160-unit development (perhaps with minimal design changes required) than those considered by the City" (A 68), namely, Sites 9 and 41. HUD stated that "(t)he City's most convincing reason in opposition to transfer of the project to an alternative site is the certainty of an additional long delay before construction could commence on any alternative site selected." (A 69). The added delay was estimated to be at least two years; whereas the HDA estimated that construction could start on Site 30 within six months. The City's need for low-income housing within the area was cited as an additional reason for retaining Site 30 for this purpose as well as possible litigation or protest by residents of the alternative areas.
 
 
 5
 As to Site 9, HUD found that "(f)rom the standpoint of social environmental impact, this location (Site 9) could be superior to Site 30 for the development of low-rent housing" and that at Site 9 "the total concentration would be smaller. . . ." (A 69). As to Site 41, HUD said that this site "is a very appropriate alternative site" but feared opposition from the residents of the area "although it appears to be quite a rational decision, within the context of the Plan and its objectives to facilitate an integrated community" (A 67). Despite these pro and con arguments, HUD came to the conclusion that "(m) easured against the environmental costs associated with the minimum two-year delay, the benefits seem insufficient to justify a mandated substitution of sites" (A 70). HUD also expressed the view that "(t)he continued inability of government to meet these needs (more low-rent housing for people of low income) would be considered an adverse environmental effect of transfer to another site" (A 69).
 
 
 6
 HUD, in dealing with the question of "Dispersal of Low Income Units on More Sites", stated:
 
 
 7
 "For example, attitudes of low-income and minority persons toward street life are frequently conditioned by the economic limitations on their mobility and by their cultural heritage. Their use of public space is often in conflict with the values of middle and upper-class people, mobile and able to spend leisure time away from home. Differing social and cultural attitudes about territoriality and privacy, acoustical as well as spatial, could fuel the tension which excessively close physical relationships between 'vest-pocket' projects and high-cost housing might generate." (A 71).
 
 
 8
 In its analysis, HDA has said that "(t)he high level of economic integration in the area, however, makes concern about additional public housing on Site 30 seem unwarranted." (A 113).
 
 
 9
 This statement would appear to be at variance with the facts as stated by the parties in their briefs which are to the effect that West 91st Street is presently lined with low-income housing.
 
 
 10
 The question which now arises is: what is the role of a federal appellate court at this stage of the proceedings?
 
 
 11
 In the report of HDA, the City's Housing Authority and the City Planning Commission, dated November 17, 1976 (A 82), a history of the WSURA Plan is set forth, including amongst other things, a statement that "(t)he objectives were to accommodate the housing needs of all residents of all income levels . . ." (A 88) and that "(t)he Urban Renewal Plan's objective is to create a racially and economically integrated community" (A 110). Apparently, because of the large numbers of low-income families living in sub-standard housing, the City changed these objectives. As a result, Site 30 was to be used for a 100 per cent low-income high-rise (17-story) apartment building.
 
 
 12
 In seeking the scope of our reviewing powers we must look to the Congressional source, the National Environment Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 Et seq., and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) (1976) which provides in part:
 
 
 13
 "The reviewing court shall
 
 
 14
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 15
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."
 
 
 16
 The provisions of NEPA contain the substantive standards necessary to review the merits of agency decisions under the APA. A mere reading of the HUD report reveals many warning signals which must be considered in relation to the local environment. The City proposes to build a 17-story apartment building exclusively for low-income tenants in an area already containing a high percentage of low-income housing. This alone constitutes concentration. Regardless of whether this would cause so-called "tipping", it is not the integration contemplated by NEPA.
 
 
 17
 Despite HUD's assurances that such a development would "not substantially change the income, racial, ethnic or age distribution of the neighborhood or community" (a questionable assumption) and that "(t)he proposed low-income project will have only a fractional effect on the economic balance of WSURA's population," (A 54) these area statistics will not affect the lives of the present residents on West 91st Street.
 
 
 18
 General comment about the "potential social environmental impacts" is stated as follows:
 
 
 19
 "While the choice of Site 30 for development as a 100 percent low-income project has raised valid questions about the potential social environmental impacts involved, the problems associated with the impact on social fabric and community structures are not considered so serious as to require that this component be rated as unacceptable." (A 58).
 
 
 20
 The importance of this decision lies in the fact that once a high-rise low-income apartment is built on Site 30, the character of the neighborhood is permanently established at least for the life of the structure if as represented, its adds to an already concentrated group of low-income buildings. This construction will not be a temporary stop-gap to enable the City to solve its problem for adequate housing for its low-income population. The Congress did not authorize the use of federal resources for this single purpose. To the contrary it said, in part:
 
 
 21
 "(I)t is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans . . . and resources to the end that the Nation may . . . (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations . . . ." (NEPA § 101, 42 U.S.C. § 4331 (1976)).
 
 
 22
 HUD is not an agency merely to support whatever plan the City may find to be expedient in solving its problems. Its careful analysis of the various sites has shown that it has given "consideration" to alternatives. But "consideration" is not an end in itself. Ultimately there must be a decision and by some decision-maker.
 
 
 23
 We do not depart from our statement that the function of an Environmental Impact Statement (EIS) (here the Special Environmental Clearance) is to set forth "sufficient information to enable the decision-maker to consider fully the Environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives". County of Suffolk v. Secretary of Interior,562 F.2d 1368, 1375 (2d Cir. 1977), Cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).
 
 
 24
 The HUD Secretary herself has said (after commenting that the HUD report had extensively criticized the City's conclusions (HUD's Br. 35)):
 
 
 25
 "The Clearance nevertheless concludes, reasonably, that transferring the site would only cause additional unnecessary delay, and might generate opposition from the project's new neighbors, while alleviating that of the plaintiffs in this action. Under these circumstances, the agency was not required by NEPA to choose an alternative location." (HUD's Br. at 35).
 
 
 26
 It is thus quite evident that delay (outranking all other environmental considerations) was a paramount factor in HUD's decision witness, its statement that "(t)he City's most convincing reason in opposition to transfer of the project to an alternative site is the certainty of an additional long delay before construction could commence on any alternative site selected" (A 69), which statement immediately followed HUD's own conclusion, previously stated, that "(f)rom the standpoint of social environmental impact, this (Site 9) would be superior to Site 30 for the development of low-rent public housing" (A 69). But Congress, in authorizing federal aid and creating HUD itself, had exactly "social environmental impact" in mind as expressed in the statute. Neither the City in its desire to take care of its low-income residents nor HUD itself had the power to override this Congressional purpose. Therefore, consistent with our position taken in Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973), we hold that delay is not to be regarded as an overriding factor and that environmental factors, such as crowding low-income housing into a concentrated area, should be given determinative weight.
 
 
 27
 On remand, it may well be that consideration should also be given by HUD to the construction of a building containing a reasonable percentage of moderate-income residents as envisaged by the original Plan. Nor should recent developments or thinking with respect to a trend away from high-rise apartments, particularly where children would be involved, be ignored.
 
 
 28
 The fact that the development of Site 30 was authorized prior to the recently expressed thoughts on the subject of the wisdom of high-rise apartments, even though not retroactive, should not deter HUD from giving consideration to them. No construction has yet been commenced. It would be folly not to heed the most modern thinking on the subject where a major undertaking is involved. After all, what doctor would fail to use the most recently discovered curative medicine merely because the patient had become ill prior to its discovery?
 
 
 29
 Although we regret further delay, we hold that delay is an impermissible factor as against a further concentration of low-income housing on West 91st Street as presently proposed by the use of Site 30 for that purpose. Once the area is committed to a high concentration of low-income housing, the Congressional purpose of racial and economic integration is thwarted. We reiterate what we said in Otero :
 
 
 30
 "An additional source of the affirmative duty to integrate is found in the 1968 Fair Housing Act . . . which provides that '(i)t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States,' 42 U.S.C. § 3601 and, in § 3608, that '(d) The Secretary of Housing and Urban Development shall . . . (5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this sub-chapter'."
 
 
 31
 "However, we are satisfied that the affirmative duty placed on the Secretary of HUD by § 3608(d)(5) and through him on other agencies administering federally-assisted housing programs also requires that consideration be given to the impact of proposed public housing programs on the racial concentration in the area in which the proposed housing is to be built. Action must be taken to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." 484 F.2d at 1133-34.
 
 
 32
 To fulfill our conception of Congressional purpose we must take a somewhat negative position as to what is not to be done, namely, the construction of a high-rise apartment building exclusively for low-income families on Site 30. HUD has shown that there are ways to avoid such a concentration. Pending such a solution we reinstate the injunction against the construction of a low-income apartment on Site 30 and remand to the district court for further consideration in the light of this opinion.
 
 
 
 [1]
 Trinity Episcopal School Corp. v. Romney, 387 F.Supp. 1044, 1047 (S.D.N.Y.1974). The area is in the west side of Manhattan, New York City, between West 87th and 97th Streets and between Central Park West and Amsterdam Avenue
 
 
 [2]
 National Environmental Policy Act of 1969 § 102(2)(D), 42 U.S.C. § 4332(2) (D) (1976)
 
 
 [3]
 "A" refers to the Joint Appendix submitted by the parties on appeal