TRINITY EPISCOPAL SCHOOL CORPORATION and Trinity Housing Company, Inc., Plaintiffs,

and

Roland N. Karlen, Alvin C. Hudgins and Continue, Plaintiffs-Intervenors,

v.

Patricia Roberts HARRIS, Secretary of Department of Housing and Urban Development, et al., Defendants,

and

Strycker's Bay Neighborhood Council, Inc., Defendant-Intervenor.

No. 71 Civ. 4315 (IBC).

United States District Court, S. D. New York.

Jan. 19, 1978.

Demov, Morris, Levin & Shein, New York City, for plaintiffs; Eugene J. Morris, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendants; Peter C. Salerno, Asst. U. S. Atty., New York City, of counsel.

Allen G. Schwartz, Corp. Counsel for the City of New York, New York City, for City of New York; Leonard Grunstein, Asst. Corp. Counsel, New York City, of counsel.

Catherine P. Mitchell, Community Action for Legal Services, Inc., New York City, for defendant-intervenor; John de P. Douw, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

The Government has moved to dissolve the Order entered by this Court on September 25, 1975, which enjoined construction on Site 30 of the West Side Urban Renewal Area. Additionally, the Government has moved for summary judgment dismissing the complaint. Both motions are granted.

Before embarking on the discussion of the issues now before the Court, a very brief recital of the history pertaining to the instant applications is appropriate.[1] This action was commenced by plaintiffs Trinity Episcopal School Corporation (hereinafter "Trinity") and Trinity Housing Company, Inc.,[2] to enjoin conversion of the housing

---

1. A fuller chronicle of the lengthy and convoluted turmoil incident to this litigation is set forth in our opinion *Trinity v. Romney*, 387 F.Supp. 1044 (S.D.N.Y.1974).

2. By Stipulation and Order filed December 16, 1977, plaintiffs Trinity Episcopal School Corporation and Trinity Housing Company, Inc., withdrew from the litigation. Consequently, only plaintiffs-intervenors are left to carry this action forward.

project planned for Site 30 [3] of the West Side Urban Renewal Area ("WSURA") from 30 per cent low-income housing to 100 per cent low-income housing and to prevent the use of federal funds therefor. Plaintiffs Roland H. Karlen, Alvin C. Hudgins and CONTINUE (Committee Of Neighbors To Insure a Normal Urban Environment) later intervened. The named defendants included, *inter alia*, the United States Department of Housing and Urban Development ("HUD") and the City of New York. Strycker's Bay Neighborhood Council, Inc., was allowed to intervene as a defendant.

At the original trial of this action, we were presented with four issues for resolution: (1) whether the defendants had breached their contract with Trinity; (2) whether the defendants had failed to conform with the purposes and intent of the West Side Urban Renewal Plan promulgated by City and State agencies to rehabilitate a portion of WSURA which includes Site 30; (3) whether the concentration of low-income housing in Trinity's immediate area would create an impermissible "pocket ghetto" of a nonintegrated nature; and (4) whether HUD had complied with the requirements of the National Environmental Policy Act (hereinafter "NEPA"). We found in defendants' favor on all four issues.

The Court of Appeals affirmed our judgment on the first three issues, but remanded the case back to us as to the fourth. *Trinity v. Romney*, 523 F.2d 88, 95 (2d Cir. 1975). We had found HUD's determination that construction of low-income housing on Site 30 would not "significantly [affect] the quality of human environment" was not an arbitrary and capricious decision. We had therefore held that an Environmental Impact Statement ("EIS"), otherwise required by Section 102(2)(C) of NEPA, Section

4332(2)(C), Title 42 of the United States Code, would not be necessary. *Trinity*, 387 F.Supp. at 1077, 1082. Consequently we concluded, erroneously, that HUD did not have to consider alternatives to construction of low-income housing on Site 30.

Upon that error the Court of Appeals reversed and remanded holding that Section 102(2)(D) of NEPA, Section 4332(2)(D), Title 42 of the United States Code,[4] independently of Section 102(2)(C) of NEPA, imposed upon a federal agency the obligation to consider alternatives wherever a proposed federal action involves unresolved conflicts concerning alternate uses of available resources. *Trinity*, 523 F.2d at 93. The mandate by our Court of Appeals to us is clear and explicit (523 F.2d at 95):

> We find that HUD's acceptance of the "no alternatives" conclusion as a matter of law fails to meet the directive of 102(2)(D) of NEPA. We remand so that the District Court can fashion an appropriate order requiring HUD to consider reasonable alternatives to the development of Site 30 as a 100 per cent low-income housing project to the fullest extent possible using HUD regulations as guidelines for the type of alternatives and the context of urban environmental factors to be used in the process of consideration of alternatives, consistent with the scheme of the Plan.

The Circuit Court disapproved HUD's action in simply adopting the conclusion of the New York City Housing Authority ("City Housing Authority") that there were no alternative site locations because of the scarcity of land in WSURA (523 F.2d at 94):

> This blanket generalization unsupported by the evidence as to alternative sites within the area (not to mention other potential sites) does not conform with HUD's responsibilities. HUD is not re-

---

**3.** Site 30 is located on the west side of Columbus Avenue, between West 90th and West 91st Streets, in the Borough of Manhattan, City of New York. The West Side Urban Renewal Area, about twenty blocks in area, is north between West 87th and West 97th Streets, and west between Central Park West and Amsterdam Avenue.

**4.** Since the Court of Appeals announced its decision, Section 102(2)(D) of NEPA has been redesignated Section 102(2)(E). However, for clarity and convenience we will continue to refer to it as Section 102(2)(D).

quired to search out potential sites throughout the New York metropolitan area but the federal agency must itself determine what is reasonably available especially where as here the building of public housing is part of a coordinated plan to deal with the broad problem of meeting the housing needs of low income residents.

In delineating what HUD's consideration of alternatives should embrace, the Circuit Court required HUD to investigate alternatives not from a viewpoint as to how HUD or the City Housing Authority would choose to resolve the City's low-income housing situation, but "as to how within the framework of the Plan its objective of economic integration can best be achieved with a minimum of adverse environmental impact" (523 F.2d at 94):

> [HUD's search should take in] the entire West Side Urban Development Area, the percentage of low-income units in that particular location, the sizes, types and designs of existing and possible alternative housing, whether there may be ways of spreading low-income units throughout the area rather than concentrating them in a few plots such as Site 30, and whether rehabilitation of existing housing may be developed as a means of achieving the Plan's contemplated economic ratio. . . Nor is it sufficient to approach the problem on an Area-wide basis. The purpose of the Plan is integration—not concentration.

The factors to be considered by a federal agency before deciding to build in an urban environment were enumerated by the Circuit Court (523 F.2d at 93–94): site selection and design, density, displacement and relocation, quality of the built environment, impact of the environment on the current residents and their activities, decay and blight, implications for the city growth policy, traffic and parking, noise, neighborhood stability, and the existence of services and commercial enterprises to service the new residents. Against these factors, the Circuit Court held that HUD was required by

NEPA and its own regulations to consider a variety of alternatives (523 F.2d at 94): alternative locations or sites, alternative of not building, alternative designs both in use of site and size of individual apartment units and number of total units, dispersal of the low-income units on more sites in WSU-RA, alternative measures for compensating or mitigating environmental impacts, and finally, alternatives requiring action of a significantly different nature which would provide similar benefits with different impacts such as rehabilitation of existing buildings in WSURA as public housing projects.

Pursuant to the mandate of our Circuit, on September 25, 1975, we enjoined further construction of public housing on Site 30 until the mandate had been complied with. On April 25, 1977, HUD filed with this Court its completed Special Environmental Clearance (hereinafter "Clearance"). Subsequently, on September 21, 1977, the Government moved to dissolve the Court's Order of September 25, 1975, and for summary judgment dismissing the complaint in its entirety contending that the mandate of the Second Circuit had been complied with. Plaintiffs filed their answering papers on October 25, 1977; oral arguments were heard October 26 and reply papers received on November 11 and 14.[5] The Government's applications are now ready for decision.

Plaintiffs strenuously disagree with the Government that HUD has complied with the mandate of the Second Circuit. Plaintiffs insist that the "matter" be returned to HUD for further proceedings. Among the objections voiced by plaintiffs is that HUD followed Section 102(2)(C)(iii) and not Section 102(2)(D) as the Circuit Court specified. Furthermore, plaintiffs claim that in proceeding according to Section 102(2)(C) HUD avoided having to hold public hearings, a course which plaintiffs assert is necessitated by Section 102(2)(D). Plaintiffs also submit that had "the proper procedure . . . been followed, and a correct analysis . . .

---

5. We denied plaintiffs' request to surreply.

made of the elements being evaluated, it would have been established that 160 units of low-income public housing should not be built on Site 30 and the funds for such housing should be transferred out of the area [WSURA] to another site where such housing is needed and there are a number of such sites available." Plaintiffs' *Memorandum of Law* dated October 24, 1977, at page 4.

Plaintiffs additionally contend that (1) the Clearance prepared by HUD as to alternatives is a "rubber stamp" of the position of defendants in this action; [6] (2) the Clearance was prepared by individuals who are not residents of WSURA; (3) defendant Strycker Bay dominated the input and preparation of the materials included in the Clearance and the conclusions set forth in it; and (4) that the Clearance is unreasonable, arbitrary and capricious. As appears below, we find plaintiffs' conclusory assertions to be without merit either in law or fact and, accordingly, we grant the Government's motions.

*THE CLEARANCE*

The Clearance prepared by HUD and filed with this Court on April 25, 1977, is a substantial document in excess of two hundred legal-size pages. The first four pages identify the project and summarize the conclusions reached by the Clearance. The next six pages are a technical analysis of whether Site 30 is appropriate for construction of the type and size of housing which is proposed for the site from the viewpoint of the following criteria: slope stability, foundation conditions, terrain, soil permeability, water supply, impact on sanitary sewer system, impact on energy resources, and effect on neighborhood character.

The next 59 pages of the Clearance comprise the actual study ("Study") completed

by HUD in compliance with our Order. The remaining 150 pages are exhibits and attachments in support of the conclusions reached in the Clearance.

To prepare the Clearance, HUD solicited the views of those local agencies directly involved with construction on Site 30—the New York City Planning Commission, the Housing and Development Administration and the New York City Housing Authority. HUD requested each of the three local agencies to review and comment on alternatives to construction of low-income housing on Site 30. HUD also requested the agencies to provide information on a number of environmental factors relevant to HUD's assessment (Study, p. 1). In addition to soliciting views from local government agencies, HUD also sought views from the public bearing on the environmental significance of the proposed construction on Site 30. This was done through a published public notice on October 28, 1975.[7]

On the first page of the Study, HUD specifically refers to the decision of the Court of Appeals in the instant litigation and quotes that the decision required HUD

> to consider reasonable alternatives to the development of Site 30 as a 100 per cent low-income housing project to the fullest extent possible using HUD regulations as guidelines for the type of alternatives and the context of urban environmental factors to be used in the process of the consideration of alternatives, consistent with the scheme of the Plan.

Nine pages of the Study (pp. 12–20) are devoted to a detailed examination of the character of the neighborhood of WSURA. In assessing all reasonable alternatives to the fullest extent possible, HUD prepared a rigorous analysis of the existing WSURA community. We are impressed with it as

---

**6.** Presumably, by this plaintiffs mean that the Clearance is a "rubber stamp" of the City's position.

**7.** The New York Times advertisement, 3″ by 7″ long, was in the Real Estate section; it invited the public to submit "relevant facts bearing on the issue of the project's environmental significance. . . ." Of course, plaintiffs knew

that HUD was preparing such a Clearance and submitted through their counsel 45 letters apparently gathered by plaintiff CONTINUE from its members. The responses from the public (including the immediate foregoing) are collated and analyzed in Exhibit A–6 of the Clearance.

being thorough and exhaustive. Among the factors surveyed in this Study are the stability of the minority population in WSURA and the extent of economic integration. On the former point the Study concludes (at pp. 17–18):

Key social indicators such as incidence of welfare dependency and number of broken families show the WSURA tenancy to be significantly more stable than public housing tenancy generally. The high percentage of elderly, the smaller number of children, the lower proportion of minority dominance, all contribute to this agreeable social profile. . . . [T]he percentage of minors in WSURA projects [is] substantially below the customary proportion in public housing. Also noteworthy is the higher percentage of families with two adults employed.

As to the welfare recipients in WSURA, whose number HUD took to be an indicator of social pathology, the Study reviews the data and states (at p. 18) that

[it shows] a remarkable stability in the incidence of welfare recipiency in WSURA for the first five years of this decade, numerous allegations to the contrary [notwithstanding]. The numbers suggest that the welfare tenancy of the newer, economically integrated buildings in WSURA derives largely, if not exclusively from the re-housing of title-vested relocatees from temporary holding sites. By contrast, we note a substantial increase in home relief cases (without children)—citywide, borowide, community districtwide, and, in the area which surrounds WSURA.

In assaying the character of the West Side Urban Renewal Area, the Study observes that "The neighborhood social character . . . is one of healthy diversity in race, ethnicity, and income, with no convincing evidence of community instability." Study, p. 18. Earlier, the Study notes (p. 13) that

[i]n terms of investment, density, land use, development patterns and other physical components of neighborhood character, [Site 30] is clearly suitable for the proposed project. Serious questions have been raised about the suitability of the site from the viewpoint of the social character of the neighborhood, because of the existing concentration of low-rent housing units in the immediate vicinity of Site 30. WSURA is generally recognized to be a racially, ethnically and economically integrated area, where widely, but not universally held preferences for diversity and commitment to integration have helped to reduce social distance between disparate subcommunities.

After carefully weighing and sifting the extensive data HUD has compiled regarding WSURA, the Study rejects the allegation that development of more low-income housing, particularly at the location of Site 30, would jeopardize the social balance of the larger community within WSURA. HUD concludes that increased criminal activity, which plaintiffs claim would accompany the proposed construction on Site 30, does not stem from low-income housing *per se* : It is a function of "the very elements of urban life prized by the community— size, density, diversity, wealth of open space and public facilities which attract 'outsiders' from proximate areas of lesser social stability." Study, p. 18.[8]

The Study devotes a considerable space (pp. 21–23) to reviewing congestion in the neighborhood schools serving WSURA and concludes that most schools in WSURA are underutilized and could easily accommodate the students expected to be generated by a 160 unit low-income project as planned for Site 30. The Study describes the availability of employment both within and without WSURA and the accessibility of public transportation to residents of WSURA. The Study further states that the work force of 145 primary wage-earners and 13 secondary wage-earners, expected to reside in the low-income building contemplated

---

8. Before stating its conclusions, the Study indicates the pertinent data and facts it relied upon. See *County of Suffolk v. Secretary of the Interior*, Nos. 1187, 1258, 562 F.2d 1368 (2d Cir. 1977). Similar treatment appears throughout the entire Study.

for Site 30, would only have a negligible effect on the extensive mass transit facilities available throughout WSURA (Study, p. 49). HUD notes that while the City's zoning permits only 20 on-site parking spaces, they would be fully adequate:

> Forthcoming increases in gasoline fuel prices can be expected to reduce the extent of auto ownership among low-income motorists. The enforcement of alternate side [of the street] parking restrictions in the area is also an effective disincentive to auto ownership in the area.

(Study, p. 49).

Also encompassed within the Study is a consideration of whether Site 30 is adequately served by stores for shopping and whether there are sufficient playgrounds and open space (Study, pp. 24–25). HUD concludes that the recreational area annexed to the Site 30 project will accommodate the diverse needs of the project's residents and will also provide an attractive addition to the WSURA streetscape (Study, p. 46).

Hospital and social services in WSURA will only be minimally affected by the 160 households added by the use of Site 30 for low-income housing. HUD notes (at p. 47) that

> the stability, industriousness and independence of families living in NYCHA [New York City Housing Authority] projects in WSURA is markedly superior to typical public housing tenancy. Sensitive tenant selection, with full priority rights for former site occupants . . . could assure a project population with a high percentage of employed heads-of-household, a low index of welfare dependency and minimal requirements for extensive public services.

An extensive section of the Study (pp. 26–30) is devoted to a detailed and full discussion of the availability of police and fire protection within WSURA in general and for Site 30 in particular. While there are no fire companies within the geographical area of WSURA, several companies are stationed nearby and their response time to Site 30 is two minutes—well within national standards (Study, p. 26). The Study refers to a review by the New York City Fire Department, and, according to the Fire Commissioner, it has no objections regarding accessibility and availability of fire protection for the project intended for Site 30.[9]

The apparent inadequacy of police services, which was the subject addressed most often in the responses HUD received from its advertisement, is extensively reviewed. Site 30, located in a police precinct of 0.91 square miles, is considered to be in a high crime area. We had remarked, *Trinity, supra* at 1070, that crime figures from 1971 to 1973 had shown a marked decline; however, the Study notes (pp. 27–28) that since 1974 statistics indicated a marked increase in the number of homicides, rapes, burglaries, robberies and grand larcenies committed in the general area of WSURA. From 1973 to 1976, the number of criminal complaints filed in the precinct serving Site 30 has increased at a slightly greater rate than the rate for the Borough of Manhattan. Pursuing the examination further, the Study discloses (p. 28):

> Felony crime rates in 1973, however, were at a relatively low point in recent history of the 24th Precinct [covering Site 30], and reflected the marked decrease since 1971. . . . Therefore, a wider study was indicated, using 1971 as the base year. From [New York Police Department] annual statistical reports for the years 1971 through 1976, a broader tabulation of complaints within the 24th Precinct was compiles [sic]. . . .
> Use of the year 1971 as a base yields different conclusions about the increase in felony crime in the 24th Precinct. The total number of felony complaints, which had dropped 32.6 percent from 1971 to 1973, has been rising steadily but, at the

---

9. Indeed, to the extent the project on Site 30 accommodates relocatees now resident in temporary holding areas (which could be demolished or rehabilitated when vacated), there may be a net reduction in required fire department services by the elimination of non-fireproof and possibly inadequately wired tenements from the area (Study, p. 48).

end of 1976, still stood 9.4 percent below the 1971 level.[10]

In assessing the relationship between criminal activity and population, the Study observes that since 1970 there has been a sizeable net increase in the population of WSURA as numerous housing projects were completed and occupied (Study, p. 29).

The Study confesses (p. 29) the absence of objective yardsticks to measure the adequacy or inadequacy of police protection. It attributes this to the fact that "adequate police protection" is, to an extent, defined subjectively and would necessarily reflect the differing perceptions of the various segments of the neighborhood population. Nonetheless, the Study considers the number of arrests to be a relevant and objective factor. HUD acknowledges that though the 24th Precinct ranked 13th in felony complaints, it ranked 23rd among the 73 City precincts in felony arrests. The consideration HUD gives to the problem of police protection is perceptive and balanced (Study, p. 30):

> The data and analysis presented . . . show a high incidence of crime in the precinct, a fair share of which occurs in WSURA, particularly crimes against property and those crimes against the person which involve property; the "fair share" appears based on population. The arrest record of the 24th Precinct sug-

gests need for improvement, which its new Commander may be undertaking. Based on the above, a marginal rating is assigned to this component, but a recommendation is hereby made to accept the marginal component because of minimal impact, and the general ability of the New York Police Department to allocate additional resources to the 24th Precinct on a showing of need.

The Study concludes (p. 48) that the presence of low-income housing on Site 30 is not likely to have any discernible impact on the police services in the community. HUD's conclusion is based on its expectation that the City Housing Authority will tenant Site 30 with great care.[11]

HUD similarly reviews (pp. 32–33) the adequacy of social services, senior centers, youth services, and transportation services. It concludes that the present aforementioned services are adequate to meet the needs of the estimated 500 new inhabitants who would be living within the proposed housing on Site 30 [12] (Study, p. 47).

The inadequacy of sanitation services, a frequent complaint in the responses HUD received from the public, is a problem which HUD notes is not confined to WSURA; it pervades the City.[13] However, HUD concludes on the basis of field observations by its staff in 1977 that the community ap-

---

10. Percentage changes between 1971 and 1976 for individual categories of offenses are (Study, p. 28):

| Category | | Change |
|---|---|---|
| Murder and Non-negligent Manslaughter | | + 153% |
| Forcible Rape | | + 112% |
| Robbery | | − 29% |
| Felonious Assault | nc [no change | − ?] |
| Burglary | | − 4% |
| Grand Larceny | | − 17% |
| Grand Larceny-Motor Vehicle | | − 20% |
| Other Felonies | | − 14% |

11. Indeed, the operation of Site 30 by the City Housing Authority may actually reduce the demand on City police services because Housing Police will be assigned to on-site patrol functions (Study, p. 48).

12. The exception is day care facilities for infants. HUD notes that these are failing to meet the substantial demand in WSURA (Study, p. 32). However, as this shortage is equally acute

throughout the City and not peculiar to the immediate environs of Site 30 or WSURA, it is not a relevant factor in weighing alternatives to construction on Site 30.

13. The minutes of the Local Community Board indicate that the problems of sanitation (or lack thereof) affect the entire area within its baliwick (from 59th Street on the south to Cathedral Parkway on the north, from the Hudson River east to Central Park). Indeed, because the problem "[is] due to a shortage of personnel and equipment, there would be little improvement until the general public helped itself as a result of a public relations program and participation by Block Associations and the general public in enforcement and clean up." Study, p. 34. Thus, siting low-income housing elsewhere in WSURA or, for that matter, in the West Side would present the same problem with sanitation as encountered on Site 30.

peared clean and well-serviced by municipal sanitation workers (Study, p. 34).[14]

A crucial segment of the Clearance discusses the impact construction of low-income housing will have on the social fabric and community structures of WSURA (Study, pp. 38–42). WSURA, according to HUD, is racially, ethnically, and economically integrated. For various reasons the prospective residents of Site 30 are expected to reflect the same demographic characteristics of WSURA. The explanation offered (p. 38) is the small size of the project proposed for Site 30 (160 units or about 500 tenants) as well as the fact that first priority for occupancy will be given to title-vested tenants of WSURA who are now resident within the area on temporary holding sites, with a second priority in occupancy for former residents of WSURA who wish to return.

HUD also concludes that a 160 unit fully low-income project will only have a fractional effect on the economic balance of WSURA's population,[15] and that even if the impact is limited to the 25 already existing projects constructed or redeveloped in WSURA, the net increase of low-income families will be less than two percent. Within the context of the larger community, the approximate order of magnitude for the increase of low-income families will be one percent (Study, p. 39).

HUD squarely addresses an issue raised by the Circuit Court, *Trinity, supra*, at pp. 94–95, and ardently fostered by plaintiffs throughout the entire history of this litigation: the concentration of public housing within a severely limited area of WSURA. If Site 30 is developed as 100 percent low-income housing, West 91st Street from Amsterdam to Central Park West will border buildings containing 837 of the 1231 public housing units in the area (Study, p. 40). Defending the wisdom of Site 30 as the choice for additional public housing, the Study observes that

[t]he siting of 68 percent of all public housing units on a single one of the 11 crosstown axes in the area may display either insufficient sensitivity to public attitudes and urban design principles, or it may reflect a calculated administrative or political decision made after consideration of several factors which tend to mitigate the potential adverse reaction to the decision.

Study, p. 40. HUD listed (p. 40) the factors as follows:

(1) The physical appearance of the public housing project structures, existing and planned, is generally harmonious with other, nearby housing developments, and is mostly not stereotypical of New York City public housing design and construction.

(2) Compliance with WSURA Plan requirements for open space will produce an open profile on the Site 30 block, and avert a potential "Chinese Wall" effect from the adjacency of the Site 30 project and Stephen Wise Tower.

(3) One hundred of the public housing units along the 91st Street axis are located in 15 [rehabilitated] brownstones which blend into their surroundings with indifferent success. Street number signs and certain other common touches identify these structures and set them apart from their neighbors, but their appear-

---

14. "[T]he premises of other [New York City Housing Authority] projects in WSURA have invariably been clean and orderly when visited on numerous occasions by HUD staff." Study, p. 48.

15. The Study (p. 38) demonstrates this fractional effect by means of the following table:

| | Without P.H. Project on Site 30 WSURA | | With P.H. Project on Site 30 WSURA | |
|---|---|---|---|---|
| Units in economically integrated buildings | 4382 | 84.6% | 4382 | 82.1% |
| Units in low-rent housing projects | 795 | 15.4% | 955 | 17.9% |
| Units for middle/moderate income | 3390 | 65.5% | 3390 | 63.5% |
| Units for low-income | 1787 | 34.5% | 1947 | 36.5% |
| Units occupied by middle/moderate income* | 3303 | 63.8% | 3303 | 61.9% |
| Units occupied by low-income* | 1874 | 36.2% | 2034 | 38.1% |

* Assumes continued occupancy of 87 middle/moderate income units by families receiving welfare rent assistance.

ance does not scream out—"Public housing!"

(4) The tenant characteristics point to an impressive level of social and familial stability in the WSURA public housing project.

(5) Active efforts, through such programs as the Goddard-Riverside Community Center's youth program supported by CJCC, to modify anti-social behavior by area juveniles.

HUD concedes that low-income housing on Site 30 will distress the sensibilities of certain residents of the immediate area. In consequence, HUD has directed the City Housing Authority to take measures to ameliorate the impact of the housing. These measures include (pp. 40–42):

(1) requirements placed on the turnkey developer to select materials for exterior walls and surfaces which, in color and texture, depart from the materials commonly used in public housing projects.

(2) requirements placed on the turnkey developer to incorporate into the exposed exterior surfaces of the building such details or treatments which will contribute to the distinctiveness of the structure.

(3) requirements placed on the turnkey developer to assure, either through choice of materials or treatment thereof, exterior walls on the north and east facades particularly which will be either graffiti-resistant or will readily permit effective and easy removal of graffitti [sic].

(4) sensitive tenant selection by the Housing Authority, whose tenant screening and selection procedures at the controversial Forest Hills public housing project produced a project population which has been successfully integrated into the surrounding community with astonishing rapidity and lack of conflict.

(5) strict compliance with the City's commitments to provide priority in occupancy to present and former title-vested site occupants only.

(6) potential involvement of community leadership, perhaps through the vehicle of Community Board 7, in the tenant selection process, to the greatest extent permitted by law and regulation.

(7) the assignment of qualified Housing Authority personnel, after initial occupancy commences, to provide the full spectrum of tenant services available at the Authority.

(8) the assignment of adequate Housing Authority police protection for the residents of the cluster of projects around the intersection of W. 90th Street and Columbus Avenue. While the primary function would be to augment the City police services in this high-crime precinct, their visible, uniformed presence might also still some unreasoned fear of middle and upper-income class residents, and would certainly contribute to an atmosphere of orderliness in the area.

(9) an affirmative pursuit by the Housing Authority of community services to occupy the project's community space. In view of the unmet demand for day care and youth services, these might be the most appropriate uses. The Authority should consult at an early date, with the director[s] of Goddard-Riverside Community Center . . . and Goddard-Riverside Day Care Center . . . on these matters. Since Goddard-Riverside Community occupies space in both Stephen Wise Towers and in the vest-pocket project diagonally opposite Site 30, they would be the most logical group to operate and provide such services as infant and child day care, or perhaps an after-school center. While the latter might attract children from the neighboring projects as well as Site 30, it could serve as a neighborhood resource, as does the community center in the Forest Hills project.

(10) an affirmative pursuit by the Housing Authority to attract commercial occupants for the large ground-floor commercial space in the project. Choice of tenant(s) should be made on the basis of neighborhood, as well as project needs to maximize social interactions between project residents and their neighbors.

At page 42 of the Study HUD concludes [that] while the choice of Site 30 for development as a 100 percent low-income project has raised valid questions about the potential social environmental impacts involved, the problems associated with the impact on social fabric and community structures are not considered so serious as to require that this component be rated as unacceptable.

HUD conditions its approval of the low-income housing planned for Site 30 on the City's good faith compliance with the ameliorative measures HUD outlined. Towards seeing that the substance of each recommendation is implemented, the City Housing Authority is required to submit quarterly progress reports during the project's development and yearly reports thereafter (Study, p. 42).

*ALTERNATIVES*

The Study devotes pages 51 to 59 exclusively to a consideration of alternatives to construction of low-income housing on Site 30. To that objective, HUD directed the City of New York to survey the remaining nine undeveloped sites in WSURA. After that survey was completed, the City concluded (see Study, p. 51) that none of the sites were appropriate alternatives since (a) transferring the 160 units of low-income housing to another site would not silence opposition by certain segments of the WSURA community; it would only cause relocation elsewhere; (b) the substitution of any of the seven large sites would result in "under-utilization of good sites"; (c) demolition and relocation would be required for use of any alternative site and the costs thereby incurred would be, as described by the City (see Study, p. 51), "a financial hardship"; (d) tentative sponsors have been designated for each of the alternative sites; and (e) substantial delays would be imposed in relocating the development to another site.

The City also studied three sites *in extenso* but concluded that they would not be "appropriate alternatives" to proceeding with the development of Site 30 as planned. HUD summarized the City's conclusions as follows (Study, p. 52):

(a) Site 23, a mid-block parcel between W.92 and W.93 Streets, can accommodate 130 units. The City currently contemplates an urban renewal plan change to delete from planned demolition and to retain two sound structures on W.93 St. and designate them for rehabilitation. The reduced size of Site 23 could take between 80 and 100 housing units of new construction, following relocation of tenants and demolition of one additional occupied structure on site. Time delays are also considered significant.

(b) Site 45/46, an L-shaped site on the northeast corner of Columbus and W.87 and extending along the Avenue frontage to W.88, is planned for 106 units. It has only ⅔ the area of Site 30, and is not considered a viable alternative because of the "loss" of 54 units . . . (160–106) of public housing presumed to occur in the substitution. The site is occupied; the time and money costs of relocation and demolition are considered important constraints.

(c) Site 4, already designated in the WSURA Plan for low-income public housing, is to be developed under co-sponsorship of NYCHA and the New York City Educational Constructional Fund (ECF). Located on a 40,000 [square foot] parcel on the Columbus Avenue blockfront between W.96 and W.97 Streets, the planned redevelopment will include a 640-seat elementary school essential to replace obsolescent facilities in the neighborhood, in addition to 270 units of public housing, for which no application has yet been submitted to HUD. Final architectural drawings have already been prepared by NYCHA and ECF, at considerable expense.

HUD assessed the City's evaluation of alternatives and concluded that they were incomplete: They failed to address the possibilities of combining sites, of reparceling sites, of dividing the 160 units committed to by HUD onto two of the redevelopment sites, or of seeking additional funds to enable HUD to develop fully a combination

of sites. Additionally, HUD concluded that there are two sites which are even more appropriate for the transfer of the proposed 160 units planned for Site 30. The sites HUD proposes in lieu of Site 30 are Site 9, located on the west blockfront of Columbus Avenue between West 95 and West 96 Streets, and Site 41, located on the east blockfront of Columbus Avenue between West 88 and West 89 Streets. These sites are roughly comparable in size to Site 30 and their use as alternatives would entail a minimal amount of under-utilization, design change, and site clearance. HUD has some reservations as to the viability of Site 41 as a substitute for Site 30:

> In view of the extensive response to HUD's public notice from residents of W.89 Street and the nature of their comments about low-income and public housing, one might suspect that a proposal to transfer the project to their block might be even more strongly opposed, although it appears to be quite a rational decision, within the context of the Plan and its objectives to facilitate an integrated community.
>
> Study, p. 53.

■ HUD thoroughly canvasses the persuasive arguments for favoring the two alternatives it suggests. However, it recognizes that the City's reason for opposing them is valid. The added delay of possibly two years strongly militates against the selection of another site.[16] HUD's observation as to the possibility of relocating the low-income housing presently designated for Site 30 is well-stated (Study, p. 54):

While relocation of the project from Site 30 will certainly reduce the fears and negative perceptions of some WSURA residents, it will certainly increase the fears, hostility and opposition of others if Site 41 is chosen as the alternative. The possibility of new litigation should not be discounted, which would add to the delays. The environmental benefits of transferring the project to Site 41 are considered to be questionable, in view of the apparent spatial distribution of Site 30 opponents. Transfer to Site 9 is less likely to generate the extensive community opposition which would add inestimable time to the mandated delays through redesign and redesignation by appropriate agencies. The environmental benefits of transfer to Site 9 are relatively small and directed at a rather narrow range of beneficiaries (primarily CONTINUE and other opponents to Site 30 project). Measured against the environmental costs associated with the minimum two-year delay, the benefits seem insufficient to justify a mandated substitution of sites.

HUD next considers alternative designs (e. g., apartment size distribution and size of project). The City is quoted by HUD as opposing either reducing the size of the project on Site 30 or the apartment sizes which will be offered.[17] HUD concurs, noting that while the project as presently designed may provide more units than are required by the remaining families to be relocated, there appears to be more than enough relocatees residing outside WSURA to fill Site 30 (Study, p. 54). Indeed, the

---

16. That is the time estimated by City Housing Authority professionals as required for completing the approval process (before construction can start). New borings, new foundation plans and perhaps major design changes might be required. In view of the four years already consumed by the instant litigation, an additional two years of delay in meeting the intense need for low-income housing may properly be treated as an unacceptable environmental effect of the transfer to another site. This is especially cogent as the City Housing Authority estimates that once the injunction over Site 30 is lifted, construction can start in six months (Study, p. 53).

17. "The City rejects these alternatives on the basis of: compatibility of planned project with neighboring development; diseconomies of scale caused by project size reductions; the need to adjust the development potential of other sites 'to conform to the Urban Renewal Plan'; and, decidedly more relevant, because the apartment size distribution provides 'a range of apartment sizes that would meet the requirements of the remaining relocation workload.'" Study, p. 54.

project is actually below the zoned development capacity of the site. HUD concludes (Study, p. 54):

> Further reduction appears unjustified, with no concomitant environmental benefits to be discerned. The objections to reuse of the site for public housing have centered on the character, rather than than [sic] the intensity of use. That character would not be significantly altered if the project were 150 or 120 or 100 units.

HUD adopts the City's proposal that the recreational area of Site 30 be on the southern portion of the site which "not only maximizes its exposure to the sun for the benefit of the residents, but also reduces the amount of plaza and street activity which will occur in the immediate vicinity of the Trinity School." Study, p. 54.

HUD also considered the possibility of dispersing the low-income units on more sites. While this would relieve to a certain extent the concentration of public housing on the West 91st axis mentioned earlier (see Study, p. 40), the environmental detriments are noted. These include little room for outdoor recreational space (though HUD notes this is of little concern as WSURA abounds with such spaces), and scale-related increases in per-unit costs of construction, management and maintenance, which would reduce the number of units the City Housing Authority could afford to build. Finally, HUD notes that dispersal of low-income units may exacerbate the already strained class relations in WSURA (Study, p. 55):

> [By dispersing low-income units, there is] increased potential for inter-group and/or use conflicts, based on the inability to provide adequate buffer space on small mid-block sites to accommodate differing life-styles by the various economic sub-communities.

HUD reviewed the reasons advanced by the City in rejecting the rehabilitation of existing buildings as an alternative to construction of low-income housing on Site 30. The City, HUD concluded, was in error in stating that federal funding would not be available for rehabilitating tenements.[18] Nonetheless, HUD approved the City's decision not to divert the limited funds available from one category of assistance to another category (Study, p. 56):

> [G]iven the tremendous housing need in New York and the finite nature of resources available . . ., City officials decided not to seek Section 8 funds for rehabilitation within WSURA, despite several opportunities to do so, in view of higher priority needs elsewhere in the City. This political decision appears justifiable when viewed within the context of urban environmental factors affecting other and needier neighborhoods especially those which do not have the benefit of either private investment or of a Federal commitment for 160 units of low-rent public housing.

Furthermore, Section 8 housing, which would disperse low-income families as subsidized tenants in privately owned buildings, has little merit when put to large scale use. Secondly, the level of assistance available under Section 8 is less than the rent charged in most privately owned multi-family housing in WSURA. Consequently, Section 8 is not considered feasible for use in WSURA.

Alternative uses for Site 30 were considered by HUD. Included among these were the following potential uses: retail-commercial; office-commercial; public park; public facility; off-street parking. HUD rejected commercial development since "the amount of such space judged to be marketable in this location is far below the development capacity of the site and would cause an unacceptable level of underutilization." Study, p. 57. Because of the abundance of parks in WSURA (it borders Central Park), converting Site 30 to a park would be superfluous. As a park, Site 30's small size (⅔ acre) would invite conflict

18. Funding, according to HUD, would be available from the federal government under Section 8 of the Housing Assistance Program (Study, p. 56). See Title 42 of U.S. Code, Sections 1437 *et seq.*, 1437f.

**218**

between those residing on its boundaries and those using it for recreation. Finally, at present, there is only minimal need for an additional public facility in WSURA. This, when combined with the City's inability to fund capital projects of less than urgent need, rules out that option.

Development of Site 30 as "tax-abated" or "full-taxpaying" housing could be accomplished with only a minor plan change. Though HUD questions the feasibility of erecting a luxury high-rise on Site 30, HUD finds it possible to use Site 30 for low-density, fully taxpaying modern townhouses. However, weighed against this alternative is the heavy environmental cost of failing to meet the continued deficiency of low-income housing in WSURA.

Finally, HUD considers the alternative of no project development on Site 30. This would mean no additional low-income housing in WSURA as the alternatives of different locations, methods and designs were treated by HUD previously. HUD rejects this option (Study, p. 58):

A decision for government to abandon the objective of providing decent, safe and sanitary housing for low-income persons in the superior urban environment offered in the West Side Urban Renewal Area, absent the assurance of effective means of sheltering such persons in WSURA in private-market housing, would appear to involve a constellation of unacceptable urban environmental impacts including, potentially, income and racial segregation.

The need for clean and safe low-income housing is pressing in New York City. When it is juxtaposed against the scarcity of alternative sites for such housing in WSURA, the no-build option would unquestionably lead to inter-group tension in the neighborhood which would be a potential adverse social environmental impact of greater magnitude than the more limited potential adverse effects of public housing construction on Site 30. Study, p. 59.

## LEGAL DISCUSSION

■ We find the Clearance and Study submitted by HUD to this Court on April 25, 1977, herein extensively reviewed, satisfies the mandate of the Second Circuit. HUD has considered reasonable alternatives to the development of Site 30 as a 100 percent low-income housing project. It has done this exhaustively using its regulations as guidelines. It has considered alternatives against the full spectrum of urban environmental factors as well as against all the factors the Court of Appeals listed in its opinion.

It is true that in considering alternatives HUD proceeded pursuant to Section 102(2)(C) and not Section 102(2)(D) of NEPA referred to in the mandate of the Court of Appeals in remanding this case back to us.[19] However, this difference is harmless as we do not believe Section 102(2)(D) imposes as intensive or as thorough a consideration of alternatives as that mandated by Section 102(2)(C). To infer otherwise would be contrary to the plain structure and intent of Section 102(2). Section 102(2)(D) is applicable if there are unresolved conflicts concerning alternative uses of available resources. *Trinity v. Romney,* 523 F.2d 88, 93 (2d Cir. 1975); *New York City v. United States,* 337 F.Supp. 150, 159 (E.D.N.Y.1972) (Friendly, J.). Significantly, Section 102(2)(C) is not triggered unless there are proposed "major federal actions significantly affecting the quality of

**19.** Section 102(2) reads in pertinent part as follows:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall— . . . (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on— . . . (iii) alternatives to the proposed action . . . . (E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . .

the human environment." *Hanley v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972). It therefore follows that Section 102(2)(D) imposes upon a federal agency the more routine duty of studying, developing and describing alternatives to contemplated actions of the federal government. See 40 C.F.R. §§ 1500.6, 1500.8 (1976). While both Sections 102(2)(D) and 102(2)(C) implement the Congressional intent behind NEPA "[to require] all federal agencies to consider values of environmental preservation in their spheres of activity," *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission*, 146 U.S.App.D.C. 33, 35, 449 F.2d 1109, 1111 (1971), the degree of scrutiny necessitated by Section 102(2)(D) is not as intensive or as far-ranging as that under 102(2)(C).

Though plaintiffs knew a few days after October 14, 1975, that HUD was definitely proceeding under Section 102(2)(C) (see oral argument of Eugene Morris, Esq., Official Minutes, October 26, 1977, at p. 40), they apparently were not deeply troubled by this as they failed to formally move this Court for an order requiring HUD to proceed differently. Instead, they were content with writing a letter to the Area Office of HUD to note this discrepancy. If plaintiffs believed then, as they fervently insist now, that HUD's departure from the mandate of the Second Circuit was so material as to utterly negate the purpose of NEPA, they were obligated to promptly bring this matter to our attention. There is no dispute that we had continuing jurisdiction; we could have resolved this problem back then with far less inconvenience and burden upon the litigants and the general public (who, it cannot be denied, have an interest in the prompt resolution of this litigation) than we can at this late date. Notwithstanding, we have examined the merits of plaintiffs' claim. We conclude, as we have already stated, that HUD's deviation from the mandate of the Second Circuit was harmless and inconsequential.

■ Even were Section 102(2)(D) to be interpreted as requiring the federal agency to make as rigorous and detailed an evaluation as that required by Section 102(2)(C), we would find that the Clearance submitted by HUD clearly meets that test—actually exceeds it. See *Monroe County v. Volpe*, 472 F.2d 693, 697 (2d Cir. 1972); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1134 (5th Cir. 1974). Very recently, our Circuit had occasion to set forth the criteria to be employed in reviewing an Environmental Impact Statement prepared pursuant to Section 102(2)(C):

> [In deciding whether an EIS contains] sufficient information to satisfy Section 102(2)(C) of NEPA . . . a court is governed by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives. *County of Suffolk v. Secretary of the Interior*, Nos. 1187, 1258, 562 F.2d 1368 at 1375 (2d Cir. 1977) (citations omitted).

Thus, as we noted at the inception of this decision, a federal agency cannot satisfy Section 102(2)(C) by a conclusory, superficial consideration of alternatives. The agency must go beyond mere assertions and indicate its basis for them. *I–291 Why? Association v. Burns*, 372 F.Supp. 223 (D.Conn.1974), *aff'd per curiam*, 517 F.2d 1077 (2d Cir. 1975).

■ In reviewing the Clearance now before us, it is well to remember that the aim of NEPA was not to abolish economic or technical progress but to have federal agencies balance environmental concerns against the material gains of "progress." NEPA requires these agencies to incorporate into their decision-making process a systematic consideration and balancing of these possibly diverse goals. *Calvert Cliffs, supra,* 146

U.S.App.D.C. at 36, 449 F.2d at 1112. Furthermore, in remanding the instant case back to us, the Second Circuit clearly enunciated that the solution to unbalanced housing of which plaintiffs complain is not for the courts but for the agencies. *Trinity, supra,* 523 F.2d at 95. In reviewing the adequacy of HUD's consideration of alternatives, we have been mindful of these constraints and have endeavored to avoid substituting what we may prefer for what the duly authorized agencies have resolved for Site 30 after good faith deliberation.

■ We find the consideration by Clearance of alternatives a very illuminating and factual discussion of all appropriate options to construction of 100 percent low-income housing on Site 30. Indeed, it would be on the merits to describe it as an exhaustive study. We find that HUD discharged its duty to examine alternatives with good faith objectivity. HUD did not generate a mountain of paper to rationalize a prejudgment to which it had committed itself.

■ In judging whether HUD acted in good faith, we cannot apply the requirements of NEPA retroactively. *Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123, 1129 (5th Cir. 1974). Thus, HUD was obligated to consider as relevant factors the present condition of Site 30 as well as the several years it will take to prepare possible alternative sites. In reviewing HUD's weighing of the advantages and disadvantages of the appropriate alternatives, we will not turn the clock back and compel the agency to disregard present realities or require HUD to pivot its decision on facts that no longer exist. *New York City v. United States, supra,* at 163. As we stated earlier, we are not going to "second guess" HUD as to the substantive merits or demerits of a particular alternative. Those decisions are, by Congress, committed to the good faith decision of the agency. *Hanley v. Mitchell,* 460 F.2d 640, 643 (2d Cir. 1972); *Concerned About Trident v. Schlesinger,* 400 F.Supp. 454, 480 (D.Wash.1975); *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 353 (8th Cir. 1972). The wisdom of low-income housing, its siting in WSURA, its design, or finally the decision, after a good faith consideration by HUD of alternatives pursuant to Section 102(2)(D) of NEPA, to locate it on Site 30 are not before us for review. The limited issue before us is whether the mandate of the Court of Appeals has been satisfied—has HUD fulfilled its obligations under Section 102(2)(D). *Trinity, supra,* 523 F.2d at 95.

■ Consequently, our focus in reviewing the Clearance is on the process HUD employed in arriving at the conclusions which formed the basis of its decision to construct low-income housing on Site 30 rather than on another appropriate site. The issue, therefore, is whether HUD's decision was made in good faith or whether it was arbitrary, capricious, or otherwise not in accordance with the law. *Concerned About Trident, supra,* at 481.

We find that HUD's consideration of alternatives was neither arbitrary nor capricious. It was done in good faith and in full accordance with the law. See Section 706(2)(A) of the Administrative Procedure Act; *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). HUD's decision was based upon a consideration of all relevant factors, to wit, site selection and design, density, displacement and relocation of residents, quality of the built environment, impact of the environment on the current residents and their activities, decay and blight, implications for the city growth policy, traffic and parking noise, neighborhood stability, and the existence of services and commercial enterprises to service the new residents. *Trinity, supra,* 523 F.2d at 93.

HUD weighed the technical and economic advantages and disadvantages of building or not building on Site 30 together with the environmental costs and benefits flowing therefrom. HUD gave careful and detailed attention to all the environmental factors contemplated as relevant under NEPA. The agency is not expected to arrive at a perfect solution of all environmental consequences of a proposed Federal project. *County of Suffolk, supra,* at 1378; *Natural*

*Resources Defense Council v. Callaway,* 524 F.2d 79, 88 (2d Cir. 1975). We cannot disturb HUD's finding or rejection of alternatives as long as HUD's choice among them was reasoned. *County of Suffolk, supra,* at 1387.

Only by a preponderance of the evidence can plaintiffs establish their claim that the consideration by HUD of alternatives was inadequate; a *prima facie* showing of deficiencies will not suffice. *Sierra Club v. Morton,* 510 F.2d 813, 818 (5th Cir. 1975); *Sierra Club v. Callaway,* 499 F.2d 982, 992 (5th Cir. 1974); *Environmental Defense Fund, Inc., supra,* at 1131.

Plaintiffs offer no feasible alternative to construction of low-income housing on Site 30 in WSURA which will lessen the environmental impact while providing the type and quantity of housing so urgently needed. We sympathize with plaintiffs' professed fear of crime. However, plaintiffs fail to causally link crime with the presence of low-income housing. It is beyond this Court's ken to single out the reason or reasons for the sustained increase in the crime rate in WSURA over the past decade; it is apparent that soaring crime rates are not confined to the urban ghettos but, sorrowfully, afflict many areas of this country where there is no low-income housing.[20] Thus, we cannot accept the proposition that the people who dwell within low-income housing bring about crime to a greater degree than do those making up other strata of society.

Yet, even were plaintiffs' theory considered valid, we do not see how shifting low-income housing around the 20 block area of WSURA would significantly reduce the crime plaintiffs fear. Alternatives which result in similar or greater harm need not be considered. *Sierra Club v. Morton, supra,* at 825.

Furthermore, plaintiffs are decidedly wrong when they assert that HUD omitted from its Clearance all information contrary to the desirability of adding an additional 160 units of low-income housing (Affidavit of Eugene J. Morris sworn to October 24, 1977, at p. 15). HUD fully analyzed the public comment it received, both adverse and favorable, to proceeding with construction on Site 30. HUD was open and frank in revealing all the drawbacks to going ahead with low-income housing on Site 30. Plaintiffs have not brought to our attention any negative factor not considered by HUD.

The plaintiffs fail to see, or will not see, that these drawbacks are not peculiar to Site 30 but are common to WSURA and possibly to the siting of low-income housing anywhere in New York City, with the possible exception of limited areas in Staten Island or Brooklyn. Plaintiffs do not set forth substantive or dependable alternatives to show HUD's failure to consider alternatives; we consequently reject plaintiffs' argument to that end. *Upper West Fork v. Corps of Engineers,* 414 F.Supp. 908, 922 (N.D.W.Va.1976).

HUD was not required to hold public hearings prior to preparing the Clearance in which it evaluated the several alternatives to construction on Site 30. In remanding this case back to us, the Second Circuit did not specify that a public hearing would be required under HUD's obligation to consider alternatives pursuant to Section 102(2)(D) of NEPA. It goes without saying that we would have held one if it had been warranted. The Council on Environmental Quality, the federal agency charged with appraising programs and activities of the federal government in the light of NEPA, Section 4342 of Title 42, U.S. Code, has set forth criteria for determining whether a public hearing is appropriate:

**20.** The 1976 Statistical Abstract of the United States, published by the Bureau of the Census, U.S. Department of Commerce, states that for cities with populations of under 10,000, the annual percent change of rates for violent crime is as follows:

| 1965 to 1969 | 1970 to 1974 | 1974 to 1975 |
|:---:|:---:|:---:|
| 7.9 | 11.8 | 6.3 |

In cities with populations of 250,000 or more, the percent change for the comparable periods is 20.5, 3.3, and 4.6.

(1) The magnitude of the proposal in terms of economic costs, the geographic area involved, and the uniqueness or size of commitment of the resources involved;

(2) The degree of interest in the proposal, as evidenced by requests from the public and from Federal, State and local authorities that a hearing be held;

(3) The complexity of the issue and the likelihood that information will be presented at the hearing which will be of assistance to the agency in fulfilling its responsibilities under the Act; and

(4) The extent to which public involvement already has been achieved through other means, such as earlier public hearings, meetings with citizen representatives, and/or written comments on the proposed action.[21]

As hereinabove set forth, HUD solicited comments from the public through a written advertisement that appeared in the October 28, 1975 edition of The New York Times. The comments received were extensively and thoroughly analyzed and, where possible, incorporated into the Clearance. See, e. g., pp. 25, 30. See also Affidavit of Stanley Speirs sworn to November 9, 1977, at pp. 2–3.

Furthermore, and this Court well remembers this, public involvement in the decision to place low-income housing was substantially achieved when this matter was originally tried before us over a period of thirty full trial days which resulted in a record of 13 large volumes. A considerable portion of the case at that time relied upon a factual presentation which was re-examined and weighed again by HUD and considered by it in the preparation of the Clearance now before us. Indeed, significant portions of the instant Clearance make reference to the proceedings which were held before us (e. g. Neighborhood Character, pp. 12–20, and Police Protection, p. 48). Neither NEPA nor any other federal statute mandates that a public hearing automatically be held for the preparation of a report pursuant to Section 102(2)(D) of NEPA. See *Hanley v. Kleindienst*, 471 F.2d 823, 835 (2d Cir. 1972). We are firm in our belief that a public hearing would not have developed relevant information any more fully and effectively than what stands before us now. If we had looked upon it otherwise, we would have been duty-bound to have ordered a hearing.

Secondly, as the proposed conversion of Site 30 to wholly low-income housing was first made in 1971, *Trinity, supra,* 387 F.Supp. at 1057, and as it is a proposal now well-known, indeed intimately known to the residents of WSURA, another hearing would not have meaningfully broadened public knowledge about this project. The words of *Hanley v. Kleindienst, supra,* are germane:

The precise procedural steps to be adopted are better left to the agency, which should be in a better position than the court to determine whether solution of the problems faced with respect to a specific major federal action can better be achieved through a hearing or by informal acceptance of relevant data. 471 F.2d at 836.

While the issue in *Hanley, supra,* was the threshold determination of whether to prepare an EIS pursuant to Section 102(2)(C), we consider that the holding by our Court of Appeals in *Hanley* vests agencies with a limited discretion as to whether to hold a public hearing. Given the numerous and extensive opportunities the plaintiffs and the public have had to bring facts and arguments to the attention of HUD, we most emphatically cannot say that HUD abused its discretion by declining to hold a public hearing on the question of alternatives.

We also find that the Clearance prepared by HUD did not "rubber stamp" the Environmental Review prepared by the City of New York. It is well-settled law in environmental litigation that a federal agency may adopt the work of a state or local government after reviewing it as long as the federal officials have exercised their

---

**21.** 40 C.F.R. § 1500.7 (1976). While these regulations are applicable to the preparation of an EIS under Section 102(2)(C), the decision as to hold or not to hold a public hearing under Section 102(2)(D) would involve the same considerations.

own independent judgment. This the federal agencies clearly have done. *East 63rd Street Association v. Coleman*, 414 F.Supp. 1318, 1328 (S.D.N.Y.1976); *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927, 931–932 (2d Cir. 1974); *Finnish Allatoona's v. Volpe*, 355 F.Supp. 933 (N.D.Ga.1973); *Citizens Environmental Council v. Volpe*, 484 F.2d 870, 872 (10th Cir. 1973). See 38 Fed. Reg. 10865 which permits the use, after review, of initial information furnished by an applicant in the form of an EIS.

We are satisfied that HUD maintained a vigorously independent stance; it actively sought out facts and additional alternatives the City failed or neglected to consider. See Study, pp. 51–54. HUD in no way abdicated its responsibility under NEPA to consider all appropriate alternatives to the fullest extent possible. See *Greene County Planning Board v. Federal Power Commission*, 455 F.2d 412, 420 (2d Cir. 1972). We find that HUD has satisfied the "authorship" requirements of NEPA.

▮ Among the points urged by the plaintiffs is the City's alleged failure to comply with the recently enacted State Environmental Quality Review Act (Section 8–0113(3) of the New York State Environmental Law) as it affects construction in New York City. See Executive Order No. 91 issued by the Mayor of the City of New York, August 24, 1977. We find that the proposed low-income project planned for Site 30 is exempt under the terms of the Mayor's Order from filing any application thereunder as the instant project was undertaken prior to June 1, 1977. Section 4(a)(2)(i) of the aforementioned Executive Order.

The remaining points urged by plaintiffs lack merit.

The Government's motion to dissolve our Order of September 25, 1975 is granted inasmuch as it is our firm opinion that the mandate of the Court of Appeals for the Second Circuit, *Trinity et al. v. Romney et al.*, 523 F.2d 88, 95 (decided July 24, 1975), has been satisfied. Since there is no genuine issue remaining with respect to any material fact, and because defendants are entitled to judgment in their favor as a matter of law, the plaintiffs' complaint is dismissed. Settle order on notice.